# EXHIBIT A

Westlaw.

--- S.Ct. ----                                                              Page 1
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
**(Cite as: --- S.Ct. ----)**

**H**
Watters v. Wachovia Bank, N.A.
U.S.,2007.
Only the Westlaw citation is currently available.
Supreme Court of the United States
Linda A. WATTERS, Commissioner, Michigan
Office of Insurance and Financial Services,
Petitioner,
v.
WACHOVIA BANK, N.A., et al.
**No. 05-1342.**

Argued Nov. 29, 2006.
Decided April 17, 2007.

**Background:** Federally chartered bank and its
subsidiary, a state-chartered mortgage company,
brought suit against the Commissioner of the
Michigan Office of Insurance and Financial Services
seeking declaratory and injunctive relief from state
registration and inspection requirements based on
preemption of the National Bank Act. The United
States District Court for the Western District of
Michigan, 334 F.Supp.2d 957, granted summary
judgment for plaintiffs, and defendant appealed. The
Sixth Circuit Court of Appeals, 431 F.3d 556,
affirmed. Defendant sought certiorari which was
granted.

**Holdings:**The Supreme Court, Justice Ginsburg, held
that:

(1) under the National Bank Act, a national bank's
mortgage business, whether conducted by the bank
itself or through the bank's operating subsidiary, is
subject to superintendence of the Office of the
Comptroller (OCC), and not to the licensing,
reporting, and visitorial regimes of the several states
in which the subsidiary operates, and

(2) OCC regulation providing that state laws apply to
national bank operating subsidiaries to same extent as
those laws apply to the parent national bank did not
violate Tenth Amendment.

Affirmed.

Justice Stevens filed dissenting opinion in which
Chief Justice Roberts and Justice Scalia joined.

Justice Thomas took no part in consideration or
decision of case.

**[1] Banks and Banking 52 ☞235**

52 Banks and Banking
    52IV National Banks
        52k235 k. Regulation and Supervision in
General. Most Cited Cases

**States 360 ☞18.19**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.19 k. Banking and Financial or
Credit Transactions. Most Cited Cases
Under the National Bank Act, a national bank's
mortgage business, whether conducted by the bank
itself or through the bank's operating subsidiary, is
subject to superintendence of the Office of the
Comptroller (OCC), and not to the licensing,
reporting, and visitorial regimes of the several states
in which the subsidiary operates. 12 U.S.C.A. §
24(7); Federal Reserve Act, § 24(a), 12 U.S.C.A. §
371(a); 12 U.S.C.A. § 24(g)(3)(A); 12 U.S.C.A. §
484(a); 12 C.F.R. §§ 7.4000, 7.4006.

Under the National Bank Act, a national bank's
mortgage business, whether conducted by the bank
itself or through the bank's operating subsidiary, is
subject to superintendence of the Office of the
Comptroller (OCC), and not to the licensing,
reporting, and visitorial regimes of the several states
in which the subsidiary operates. 12 U.S.C.A. §
24(7); Federal Reserve Act, § 24(a), 12 U.S.C.A. §
371(a); 12 U.S.C.A. § 24(g)(3)(A); 12 U.S.C.A. §
484(a); 12 C.F.R. §§ 7.4000, 7.4006.

**[2] Banks and Banking 52 ☞233**

52 Banks and Banking
    52IV National Banks
        52k233 k. Power to Control and Regulate.
Most Cited Cases

--- S.Ct. ----

--- S.Ct. ----, 2007 WL 1119539 (U.S.)

**(Cite as: --- S.Ct. ----)**

**States 360 ☜18.19**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.19 k. Banking and Financial or
Credit Transactions. Most Cited Cases

Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the National Bank Act (NBA). 12 U.S.C.A. § 21 et seq.

Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the National Bank Act (NBA). 12 U.S.C.A. § 21 et seq.

**[3] Banks and Banking 52 ☜233**

52 Banks and Banking
    52IV National Banks
        52k233 k. Power to Control and Regulate.
Most Cited Cases

**States 360 ☜18.19**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.19 k. Banking and Financial or
Credit Transactions. Most Cited Cases

States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers, but when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the National Bank Act (NBA), the state's regulations must give way. 12 U.S.C.A. § 21 et seq.

States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers, but when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the National Bank Act (NBA), the state's regulations must give way. 12 U.S.C.A. § 21 et seq.

**[4] Banks and Banking 52 ☜233**

52 Banks and Banking
    52IV National Banks
        52k233 k. Power to Control and Regulate.
Most Cited Cases

**States 360 ☜18.19**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.19 k. Banking and Financial or
Credit Transactions. Most Cited Cases

State law may not significantly burden a national bank's own exercise of its real estate lending power, just as it may not curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated under the National Bank Act (NBA). Federal Reserve Act, § 24(a), 12 U.S.C.A. § 371(a); 12 U.S.C.A. § 484(a); 12 C.F.R. § 34.4(a)(1).

State law may not significantly burden a national bank's own exercise of its real estate lending power, just as it may not curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated under the National Bank Act (NBA). Federal Reserve Act, § 24(a), 12 U.S.C.A. § 371(a); 12 U.S.C.A. § 484(a); 12 C.F.R. § 34.4(a)(1).

**[5] Banks and Banking 52 ☜233**

52 Banks and Banking
    52IV National Banks
        52k233 k. Power to Control and Regulate.
Most Cited Cases

**Banks and Banking 52 ☜269**

52 Banks and Banking
    52IV National Banks
        52k269 k. Loans and Discounts. Most Cited
Cases

**States 360 ☜18.19**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.19 k. Banking and Financial or
Credit Transactions. Most Cited Cases

A national bank has the power under the National Bank Act to engage in real estate lending through an operating subsidiary, subject to the same terms and conditions that govern the national bank itself; that power cannot be significantly impaired or impeded

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)

**(Cite as: --- S.Ct. ----)**

by state law. 12 U.S.C.A. § 24(7); Federal Reserve Act, § 24(a), 12 U.S.C.A. § 371(a); 12 U.S.C.A. § 24a(g)(3)(A); 12 U.S.C.A. § 484(a).

A national bank has the power under the National Bank Act to engage in real estate lending through an operating subsidiary, subject to the same terms and conditions that govern the national bank itself; that power cannot be significantly impaired or impeded by state law. 12 U.S.C.A. § 24(7); Federal Reserve Act, § 24(a), 12 U.S.C.A. § 371(a); 12 U.S.C.A. § 24a(g)(3)(A); 12 U.S.C.A. § 484(a).

[6] States 360 ☞4.4(1)

360 States
   360I Political Status and Relations
      360I(A) In General
         360k4.4 Powers Reserved to States
            360k4.4(1) k. In General. Most Cited Cases
If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the states. U.S.C.A. Const.Amend. 10.

[7] Banks and Banking 52 ☞233

52 Banks and Banking
   52IV National Banks
      52k233 k. Power to Control and Regulate. Most Cited Cases

Commerce 83 ☞56

83 Commerce
   83II Application to Particular Subjects and Methods of Regulation
      83II(B) Conduct of Business in General
         83k56 k. Regulation and Conduct in General; Particular Businesses. Most Cited Cases

States 360 ☞4.16(2)

360 States
   360I Political Status and Relations
      360I(A) In General
         360k4.16 Powers of United States and Infringement on State Powers
            360k4.16(2) k. Federal Laws Invading State Powers. Most Cited Cases
Regulation of the Office of Comptroller providing that state laws apply to national bank operating subsidiaries to same extent as those laws apply to the parent national bank did not violate Tenth Amendment, as regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses. U.S.C.A. Const. Art. 1, § 8, cls. 3, 18; 12 C.F.R. § 7.4006.

Regulation of the Office of Comptroller providing that state laws apply to national bank operating subsidiaries to same extent as those laws apply to the parent national bank did not violate Tenth Amendment, as regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses. U.S.C.A. Const. Art. 1, § 8, cls. 3, 18; 12 C.F.R. § 7.4006.

Regulation of the Office of Comptroller providing that state laws apply to national bank operating subsidiaries to same extent as those laws apply to the parent national bank did not violate Tenth Amendment, as regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses. U.S.C.A. Const. Art. 1, § 8, cls. 3, 18; 12 C.F.R. § 7.4006.

*Syllabus* [FN*]

[FN*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

*1 National banks' business activities are controlled by the National Bank Act (NBA), 12 U.S.C. § 1 *et seq.,* and regulations promulgated thereunder by the Office of the Comptroller of the Currency (OCC), see § § 24, 93a, 371(a). OCC is charged with supervision of the NBA and, thus, oversees the banks' operations and interactions with customers. See *NationsBank of N. C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 254, 256, 115 S.Ct. 810, 130 L.Ed.2d 740. The NBA grants OCC, as part of its supervisory authority, visitorial powers to audit the banks' books and records, largely to the exclusion of other state or federal entities. See § 484(a); 12 CFR § 7.4000. The NBA specifically authorizes federally chartered banks to engage in real estate lending, 12 U.S.C. § 371, and "[t]o exercise ... such incidental powers as shall be necessary to carry on the business of banking," § 24 Seventh. Among incidental powers, national banks may conduct certain activities through "operating subsidiaries," discrete entities authorized

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
Page 4
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
**(Cite as: --- S.Ct. ----)**

to engage solely in activities the bank itself could undertake, and subject to the same terms and conditions as the bank. See § 24a(g)(3)(A); 12 CFR § 5.34(e).

Respondent Wachovia Bank is an OCC-chartered national banking association that conducts its real estate lending business through respondent Wachovia Mortgage Corporation, a wholly owned, North Carolina-chartered entity licensed as an operating subsidiary by OCC, and doing business in Michigan and elsewhere. Michigan law exempts banks, both national and state, from state mortgage lending regulation, but requires their subsidiaries to register with the State's Office of Insurance and Financial Services (OIFS) and submit to state supervision. Although Wachovia Mortgage initially complied with Michigan's requirements, it surrendered its Michigan registration once it became a wholly owned operating subsidiary of Wachovia Bank. Subsequently, petitioner Watters, the OIFS Commissioner, advised Wachovia Mortgage it would no longer be authorized to engage in mortgage lending in Michigan. Respondents sued for declaratory and injunctive relief, contending that the NBA and OCC's regulations preempt application of the relevant Michigan mortgage lending laws to a national bank's operating subsidiary. Watters responded that, because Wachovia Mortgage was not itself a national bank, the challenged Michigan laws were applicable and were not preempted. She also argued that the Tenth Amendment to the U.S. Constitution prohibits OCC's exclusive regulation and supervision of national banks' lending activities conducted through operating subsidiaries. Rejecting those arguments, the Federal District Court granted the Wachovia plaintiffs summary judgment in relevant part, and the Sixth Circuit affirmed.

*Held:*

1. Wachovia's mortgage business, whether conducted by the bank itself or through the bank's operating subsidiary, is subject to OCC's superintendence, and not to the licensing, reporting, and visitorial regimes of the several States in which the subsidiary operates. Pp. ---- - ----5-17.

(a) The NBA vests in nationally chartered banks enumerated powers and all "necessary" incidental powers. 12 U.S.C. § 24 Seventh. To prevent inconsistent or intrusive state regulation, the NBA provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law ... ." § 484(a). Federally chartered banks are

subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or purposes of the NBA. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way. E.g., *Barnett Bank of Marion Cty., N.A. v. Nelson,* 517 U.S. 25, 32-34, 116 S.Ct. 1103, 134 L.Ed.2d 237. The NBA expressly authorizes national banks to engage in mortgage lending, subject to OCC regulation, § 371(a). State law may not significantly burden a bank's exercise of that power, see, e.g., *Barnett Bank,* 517 U.S., at 33-34, 116 S.Ct. 1103. In particular, real estate lending, when conducted by a national bank, is immune from state visitorial control: The NBA specifically vests exclusive authority to examine and inspect in OCC. 12 U.S.C. § 484(a). The Michigan provisions at issue exempt national banks themselves from coverage. This is not simply a matter of the Michigan Legislature's grace. For, as the parties recognize, the NBA would spare a national bank from state controls of the kind here involved. Pp. ---- - ----5-10.

*2 (b) Since 1966, OCC has recognized national banks' "incidental" authority under § 24 Seventh to do business through operating subsidiaries. See 12 CFR § 5.34(e)(1). That authority is uncontested by Michigan's Commissioner. OCC licenses and oversees national bank operating subsidiaries just as it does national banks. See, e.g., § 5.34(e)(3); 12 U.S.C. § 24a(g)(3)(A). Just as duplicative state examination, supervision, and regulation would significantly burden national banks' mortgage lending, so too those state controls would interfere with that same activity when engaged in by a national bank's operating subsidiary. This Court has never held that the NBA's preemptive reach extends only to a national bank itself; instead, the Court has focused on the exercise of a national bank's *powers,* not on its corporate structure, in analyzing whether state law hampers the federally permitted activities of a national bank. See, e.g., *Barnett Bank,* 517 U.S., at 32, 116 S.Ct. 1103. And the Court has treated operating subsidiaries as equivalent to national banks with respect to powers exercised under federal law (except where federal law provides otherwise). See, e.g., *NationsBank,* 513 U.S., at 256-251, 115 S.Ct. 810. Security against significant interference by state regulators is a characteristic condition of "the business of banking" conducted by national banks, and mortgage lending is one aspect of that business. See, e.g., 12 U.S.C. § 484(a). That security should adhere whether the business is conducted by the bank itself or by an OCC-licensed operating subsidiary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whose authority to carry on the business coincides completely with the bank's.

Watters contends that if Congress meant to deny States visitorial powers over operating subsidiaries, it would have written § 484(a)'s ban on state inspection to apply not only to national banks but also to their affiliates. She points out that § 481, which authorizes OCC to examine "affiliates" of national banks, does not speak to state visitorial powers. This argument fails for two reasons. *First,* any intention regarding operating subsidiaries cannot be ascribed to the 1864 Congress that enacted § § 481 and 484, or the 1933 Congress that added the affiliate examination provisions to § 481 and the "affiliate" definition to § 221a, because operating subsidiaries were not authorized until 1966. *Second,* Watters ignores the distinctions Congress recognized among "affiliates." Unlike affiliates that may engage in functions not authorized by the NBA, an operating subsidiary is tightly tied to its parent by the specification that it may engage only in "the business of banking," § 24a(g)(3)(A). Notably, when Congress amended the NBA to provide that operating subsidiaries may "engag[e] solely in activities that national banks are permitted to engage in directly," *ibid.,* it did so in an Act providing that other affiliates, authorized to engage in nonbanking financial activities, *e.g.,* securities and insurance, are subject to state regulation in connection with those activities. See, *e.g.,* § § 1843(k), 1844(c)(4). Pp. ---- - ----10-15.

*3 (c) Recognizing the necessary consequence of national banks' authority to engage in mortgage lending through an operating subsidiary "subject to the same terms and conditions that govern the conduct of such activities by national banks," § 24a(g)(3)(A), OCC promulgated 12 CFR § 7.4006: "Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." Watters disputes OCC's authority to promulgate this regulation and contends that, because preemption is a legal question for determination by courts, § 7.4006 should attract no deference. This argument is beside the point, for § 7.4006 merely clarifies and confirms what the NBA already conveys: A national bank may engage in real estate lending through an operating subsidiary, subject to the same terms and conditions that govern the bank itself; that power cannot be significantly impaired or impeded by state law. Though state law governs incorporation-related issues, state regulators cannot interfere with the "business of banking" by subjecting national banks or

their OCC-licensed operating subsidiaries to multiple audits and surveillance under rival oversight regimes. Pp. ---- - ----15-17.

2. Watters' alternative argument, that 12 CFR § 7.4006 violates the Tenth Amendment, is unavailing. The Amendment expressly disclaims any reservation to the States of a power delegated to Congress in the Constitution, *New York v. United States,* 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120. Because regulation of national bank operations is Congress' prerogative under the Commerce and Necessary and Proper Clauses, see *Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 58, 123 S.Ct. 2037, 156 L.Ed.2d 46, the Amendment is not implicated here. P. ----17.

431 F.3d 556, affirmed.

*4 GINSBURG, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA, J., joined. THOMAS, J., took no part in the consideration or decision of the case.

E. John Blanchard, for petitioner.
Robert A. Long, for respondents.
Sri Srinivasan, for the United States as amicus curiae, by special leave of the Court, supporting the respondents.
Michael A. Cox, Attorney General, Thomas L. Casey, Solicitor General, Counsel of Record, Lansing, Michigan, E. John Blanchard, Assistant Attorney General, for Petitioners.
Lori McAllister, William J. Perrone, Dykema Gossett PLLC, Lansing, MI, Robert A. Long, Counsel of Record, Stuart C. Stock, Keith A. Noreika, Emily Johnson Henn, Covington & Burling LLP, Washington, DC, for Respondents.For U.S. Supreme Court briefs, see:2006 WL 2570336 (Pet.Brief)2006 WL 3243131 (Resp.Brief)2006 WL 3387939 (Reply.Brief)
Justice GINSBURG delivered the opinion of the Court.

[1] Business activities of national banks are controlled by the National Bank Act (NBA or Act), 12 U.S.C. § 1 *et seq.,* and regulations promulgated thereunder by the Office of the Comptroller of the Currency (OCC). See § § 24, 93a, 371(a). As the agency charged by Congress with supervision of the NBA, OCC oversees the operations of national banks and their interactions with customers. See *NationsBank of N. C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 254, 256, 115 S.Ct. 810, 130

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
**(Cite as: --- S.Ct. ----)**

L.Ed.2d 740 (1995). The agency exercises visitorial powers, including the authority to audit the bank's books and records, largely to the exclusion of other governmental entities, state or federal. See § 484(a); 12 CFR § 7.4000 (2006).

The NBA specifically authorizes federally chartered banks to engage in real estate lending. 12 U.S.C. § 371. It also provides that banks shall have power "[t]o exercise ... all such incidental powers as shall be necessary to carry on the business of banking." § 24 Seventh. Among incidental powers, national banks may conduct certain activities through "operating subsidiaries," discrete entities authorized to engage solely in activities the bank itself could undertake, and subject to the same terms and conditions as those applicable to the bank. See § 24a(g)(3)(A); 12 CFR § 5.34(e) (2006).

Respondent Wachovia Bank, a national bank, conducts its real estate lending business through Wachovia Mortgage Corporation, a wholly owned, state-chartered entity, licensed as an operating subsidiary by OCC. It is uncontested in this suit that Wachovia's real estate business, if conducted by the national bank itself, would be subject to OCC's superintendence, to the exclusion of state registration requirements and visitorial authority. The question in dispute is whether the bank's mortgage lending activities remain outside the governance of state licensing and auditing agencies when those activities are conducted, not by a division or department of the bank, but by the bank's operating subsidiary. In accord with the Courts of Appeals that have addressed the issue, [FN1] we hold that Wachovia's mortgage business, whether conducted by the bank itself or through the bank's operating subsidiary, is subject to OCC's superintendence, and not to the licensing, reporting, and visitorial regimes of the several States in which the subsidiary operates.

    FN1. *National City Bank of Indiana v. Turnbaugh,* 463 F.3d 325 (C.A.4 2006); *Wachovia Bank, N.A. v. Burke,* 414 F.3d 305 (C.A.2 2005); 431 F.3d 556 (C.A.6 2005) (case below); *Wells Fargo Bank N.A. v. Boutris,* 419 F.3d 949 (C.A.9 2005).

                    I

**\*5** Wachovia Bank is a national banking association chartered by OCC. Respondent Wachovia Mortgage is a North Carolina corporation that engages in the business of real estate lending in the State of Michigan and elsewhere. Michigan's statutory regime exempts banks, both national and state, from state mortgage lending regulation, but requires mortgage brokers, lenders, and servicers that are subsidiaries of national banks to register with the State's Office of Insurance and Financial Services (OIFS) and submit to state supervision. Mich. Comp. Laws Ann. § § 445.1656(1), 445.1679(1)(a) (West 2002), 493.52(1), and 493.53a(d) (West 1998).[FN2] From 1997 until 2003, Wachovia Mortgage was registered with OIFS to engage in mortgage lending. As a registrant, Wachovia Mortgage was required, *inter alia,* to pay an annual operating fee, file an annual report, and open its books and records to inspection by OIFS examiners. § § 445.1657, 445.1658, 445.1671 (West 2002), 493.54, 493.56a(2), (13) (West 1998).

    FN2. Michigan's law exempts subsidiaries of national banks that maintain a main office or branch office in Michigan. Mich. Comp. Laws Ann. § § 445.1652(1)(b) (West Supp.2006), 445.1675(m) (West 2002), 493.53a(d) (West 1998). Wachovia Bank has no such office in Michigan.

Petitioner Linda Watters, the commissioner of OIFS, administers the State's lending laws. She exercises "general supervision and control" over registered lenders, and has authority to conduct examinations and investigations and to enforce requirements against registrants. See § § 445.1661, 445.1665, 445.1666 (West 2002), 493.58, 493.56b, 493.59, 493.62a (West 1998 and Supp.2005). She also has authority to investigate consumer complaints and take enforcement action if she finds that a complaint is not "being adequately pursued by the appropriate federal regulatory authority." § 445.1663(2) (West 2002).

On January 1, 2003, Wachovia Mortgage became a wholly owned operating subsidiary of Wachovia Bank. Three months later, Wachovia Mortgage advised the State of Michigan that it was surrendering its mortgage lending registration. Because it had become an operating subsidiary of a national bank, Wachovia Mortgage maintained, Michigan's registration and inspection requirements were preempted. Watters responded with a letter advising Wachovia Mortgage that it would no longer be authorized to conduct mortgage lending activities in Michigan.

Wachovia Mortgage and Wachovia Bank filed suit against Watters, in her official capacity as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
Page 7
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
**(Cite as: --- S.Ct. ----)**

commissioner, in the United States District Court for the Western District of Michigan. They sought declaratory and injunctive relief prohibiting Watters from enforcing Michigan's registration prescriptions against Wachovia Mortgage, and from interfering with OCC's exclusive visitorial authority. The NBA and regulations promulgated thereunder, they urged, vest supervisory authority in OCC and preempt the application of the state-law controls at issue. Specifically, Wachovia Mortgage and Wachovia Bank challenged as preempted certain provisions of two Michigan statutes-the Mortgage Brokers, Lenders, and Services Licensing Act and the Secondary Mortgage Loan Act. The challenged provisions (1) require mortgage lenders-including national bank operating subsidiaries but not national banks themselves-to register and pay fees to the State before they may conduct banking activities in Michigan, and authorize the commissioner to deny or revoke registrations, § § 445.1652(1) (West Supp.2006), 445.1656(1)(d) (West 2002), 445.1657(1), 445.1658, 445.1679(1)(a), 493.52(1) (West 1998), 493.53a(d), 493.54, 493.55(4), 493.56a(2), and 493.61; (2) require submission of annual financial statements to the commissioner and retention of certain documents in a particular format, § § 445.1657(2) (West 2002), 445.1671, 493.56a(2) (West 1998); (3) grant the commissioner inspection and enforcement authority over registrants, § § 445.1661 (West 2002), 493.56b (West Supp.2005); and (4) authorize the commissioner to take regulatory or enforcement actions against covered lenders, § § 445.1665 (West 2002), 445.1666, 493.58-59, and 493.62a (West 1998).

In response, Watters argued that, because Wachovia Mortgage was not itself a national bank, the challenged Michigan controls were applicable and were not preempted. She also contended that the Tenth Amendment to the Constitution of the United States prohibits OCC's exclusive superintendence of national bank lending activities conducted through operating subsidiaries.

*6 The District Court granted summary judgment to the banks in relevant part. 334 F.Supp.2d 957, 966 (W.D.Mich.2004). Invoking the two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court deferred to the Comptroller's determination that an operating subsidiary is subject to state regulation only to the extent that the parent bank would be if it performed the same functions. 334 F.Supp.2d, at 963-965 (citing, *e.g.,* 12 CFR § § 5.34(e)(3), 7.4006 (2004)).

The court also rejected Watters' Tenth Amendment argument. 334 F.Supp.2d, at 965-966. The Sixth Circuit affirmed. 431 F.3d 556 (2005). We granted certiorari. 547 U.S. ----, 126 S.Ct. 2900, 165 L.Ed.2d 915 (2006).

II

A

Nearly two hundred years ago, in *McCulloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819), this Court held federal law supreme over state law with respect to national banking. Though the bank at issue in *McCulloch* was short-lived, a federal banking system reemerged in the Civil War era. See *Atherton v. FDIC,* 519 U.S. 213, 221-222, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997); B. Hammond, Banks and Politics in America: from the Revolution to the Civil War (1957). In 1864, Congress enacted the NBA, establishing the system of national banking still in place today. National Bank Act, ch. 106, 13 Stat. 99; [FN3] *Atherton,* 519 U.S., at 222, 117 S.Ct. 666; *Marquette Nat. Bank of Minneapolis v. First of Omaha Service Corp.,* 439 U.S. 299, 310, 314-315, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). The Act vested in nationally chartered banks enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh. To prevent inconsistent or intrusive state regulation from impairing the national system, Congress provided: "No national bank shall be subject to any visitorial powers except as authorized by Federal law ...." § 484(a).

> FN3. The Act of June 3, 1864, ch. 106, 13 Stat. 99, was originally entitled "An Act to provide a National Currency ..."; its title was altered by Congress in 1874 to "the National Bank Act." Ch. 343, 18 Stat. 123.

[2] In the years since the NBA's enactment, we have repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation. See, *e.g., Beneficial Nat. Bank v. Anderson,* 539 U.S. 1, 10, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003) (national banking system protected from "possible unfriendly State legislation" (quoting *Tiffany v. National Bank of Mo.,* 18 Wall. 409, 412, 21 L.Ed. 862 (1874))). Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
(Cite as: --- S.Ct. ----)

conflict with the letter or the general purposes of the NBA. *Davis v. Elmira Savings Bank,* 161 U.S. 275, 290, 16 S.Ct. 502, 40 L.Ed. 700 (1896). See also *Atherton,* 519 U.S., at 223, 117 S.Ct. 666. For example, state usury laws govern the maximum rate of interest national banks can charge on loans, 12 U.S.C. § 85, contracts made by national banks "are governed and construed by State laws," *National Bank v. Commonwealth,* 9 Wall. 353, 362, 19 L.Ed. 701 (1870), and national banks' "acquisition and transfer of property [are] based on State law," *ibid.* However, "the States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit. Any thing beyond this is an abuse, because it is the usurpation of power which a single State cannot give." *Farmers' and Mechanics' Nat. Bank v. Dearing,* 91 U.S. 29, 34, 23 L.Ed. 196 (1875) (internal quotation marks omitted).

[3] We have "interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state laws," *Barnett Bank of Marion Cty., N.A. v. Nelson,* 517 U.S. 25, 32, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). See also *Franklin Nat. Bank of Franklin Square v. New York,* 347 U.S. 373, 375-379, 74 S.Ct. 550, 98 L.Ed. 767 (1954). States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way. *Barnett Bank,* 517 U.S., at 32-34, 116 S.Ct. 1103 (federal law permitting national banks to sell insurance in small towns preempted state statute prohibiting banks from selling most types of insurance); *Franklin Nat. Bank,* 347 U.S., at 377-379, 74 S.Ct. 550 (local restrictions preempted because they burdened exercise of national banks' incidental power to advertise).

*7 [4] The NBA authorizes national banks to engage in mortgage lending, subject to OCC regulation. The Act provides:
"Any national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to 1828(o) of this title and such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." 12 U.S.C. § 371(a).[FN4]

FN4. Section 1828(*o*) requires federal banking agencies to adopt uniform regulations prescribing standards for real estate lending by depository institutions and sets forth criteria governing such standards. See, *e.g.,* § 1828(*o*)(2)(A) ("In prescribing standards ... the agencies shall consider-(i) the risk posed to the deposit insurance funds by such extensions of credit; (ii) the need for safe and sound operation of insured depository institutions; and (iii) the availability of credit.").

Beyond genuine dispute, state law may not significantly burden a national bank's own exercise of its real estate lending power, just as it may not curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated under the NBA. See *Barnett Bank,* 517 U.S., at 33-34, 116 S.Ct. 1103; *Franklin,* 347 U.S., at 375-379, 74 S.Ct. 550. See also 12 CFR § 34.4(a)(1) (2006) (identifying preempted state controls on mortgage lending, including licensing and registration). In particular, real estate lending, when conducted by a national bank, is immune from state visitorial control: The NBA specifically vests exclusive authority to examine and inspect in OCC. 12 U.S.C. § 484(a) ("No national bank shall be subject to any visitorial powers except as authorized by Federal law.").[FN5]

FN5. See also 2 R. Taylor, Banking Law § 37.02, p. 37-5 (2006) ( "[OCC] has exclusive authority to charter and examine [national] banks." (footnote omitted)).

Harmoniously, the Michigan provisions at issue exempt national banks from coverage. Mich. Comp. Laws Ann. § 445.1675(a) (West 2002). This is not simply a matter of the Michigan Legislature's grace. Cf. *post,* at --- - ----13-14, and n. 17. For, as the parties recognize, the NBA would have preemptive force, *i.e.,* it would spare a national bank from state controls of the kind here involved. See Brief for Petitioner 12; Brief for Respondents 14; Brief for United States as *Amicus Curiae* 9. State laws that conditioned national banks' real estate lending on registration with the State, and subjected such lending to the State's investigative and enforcement machinery would surely interfere with the banks' federally authorized business: National banks would be subject to registration, inspection, and enforcement regimes imposed not just by Michigan,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

but by all States in which the banks operate.[FN6] Diverse and duplicative superintendence of national banks' engagement in the business of banking, we observed over a century ago, is precisely what the NBA was designed to prevent: "Th[e] legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States." *Easton v. Iowa,* 188 U.S. 220, 229, 23 S.Ct. 288, 47 L.Ed. 452 (1903). Congress did not intend, we explained, "to leave the field open for the States to attempt to promote the welfare and stability of national banks by direct legislation .... [C]onfusion would necessarily result from control possessed and exercised by two independent authorities." *Id.,* at 231-232, 23 S.Ct. 288.

> FN6. See 69 Fed.Reg. 1908 (2004) ("The application of multiple, often unpredictable, different state or local restrictions and requirements prevents [national banks] from operating in the manner authorized under Federal law, is costly and burdensome, interferes with their ability to plan their business and manage their risks, and subjects them to uncertain liabilities and potential exposure.").

Recognizing the burdens and undue duplication state controls could produce, Congress included in the NBA an express command: "No national bank shall be subject to any visitorial powers except as authorized by Federal law ... ." 12 U.S.C. § 484(a). See *supra,* at ----, ----6, 8; *post,* at ----10 (acknowledging that national banks have been "exemp[t] from state visitorial authority ... for more than 140 years"). "Visitation," we have explained "is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations." *Guthrie v. Harkness,* 199 U.S. 148, 158, 26 S.Ct. 4, 50 L.Ed. 130 (1905) (internal quotation marks omitted). See also 12 CFR § 7.4000(a)(2) (2006) (defining "visitorial" power as "(i) [e]xamination of a bank; (ii)[i]nspection of a bank's books and records; (iii)[r]egulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv)[e]nforcing compliance with any applicable federal or state laws concerning those activities"). Michigan, therefore, cannot confer on its commissioner examination and enforcement authority over mortgage lending, or any

other banking business done by national banks.[FN7]

> FN7. Ours is indeed a "dual banking system." See *post,* at ---- - ----, ----1-5, 23. But it is a system that has never permitted States to license, inspect, and supervise national banks as they do state banks. The dissent repeatedly refers to the policy of "competitive equality" featured in *First Nat. Bank in Plant City v. Dickinson,* 396 U.S. 122, 131, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). See *post,* at ----, ----, ---, ----4, 14, 19, 23. Those words, however, should not be ripped from their context. *Plant City* involved the McFadden Act (Branch Banks), 44 Stat. 1228, 12 U.S.C. § 36, in which Congress expressly authorized national banks to establish branches "only when, where, and how state law would authorize a state bank to establish and operate such [branches]." 396 U.S., at 130, 90 S.Ct. 337. See also *id.,* at 131, 90 S.Ct. 337 ("[W]hile Congress has absolute authority over national banks, the [McFadden Act] has incorporated by reference the limitations which state law places on branch banking activities by state banks. Congress has deliberately settled upon a policy intended to foster competitive equality. ... [The] Act reflects the congressional concern that neither system ha[s] advantages over the other in the use of branch banking." (quoting *First Nat. Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 261, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966))). "[W]here Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies." *Barnett Bank of Marion Cty., N.A. v. Nelson,* 517 U.S. 25, 34, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). The NBA provisions before us, unlike the McFadden Act, do not condition the exercise of power by national banks on state allowance of similar exercises by state banks. See *supra,* at ---- - ----7-8.

B

**\*8** While conceding that Michigan's licensing, registration, and inspection requirements cannot be applied to national banks, see, *e.g.,* Brief for Petitioner 10, 12, Watters argues that the State's

regulatory regime survives preemption with respect to national banks' operating subsidiaries. Because such subsidiaries are separately chartered under some State's law, Watters characterizes them simply as "affiliates" of national banks, and contends that even though they are subject to OCC's superintendence, they are also subject to multistate control. *Id.*, at 17-22. We disagree.

Since 1966, OCC has recognized the "incidental" authority of national banks under § 24 Seventh to do business through operating subsidiaries. See 31 Fed.Reg. 11459-11460 (1966); 12 CFR § 5.34(e)(1) (2006) ("A national bank may conduct in an operating subsidiary activities that are permissible for a national bank to engage in directly either as part of, or incidental to, the business of banking...."). That authority is uncontested by Michigan's commissioner. See Brief for Petitioner 21 ("[N]o one disputes that 12 U.S.C. § 24 (Seventh) authorizes national banks to use nonbank operating subsidiaries ... ."). OCC licenses and oversees national bank operating subsidiaries just as it does national banks. § 5.34(e)(3) ("An operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank."); [FN8] United States Office of the Comptroller of the Currency, Related Organizations: Comptroller's Handbook 53 (Aug.2004) (hereinafter Comptroller's Handbook) ("Operating subsidiaries are subject to the same supervision and regulation as the parent bank, except where otherwise provided by law or OCC regulation.").

FN8. The regulation further provides:
"If, upon examination, the OCC determines that the operating subsidiary is operating in violation of law, regulation, or written condition, or in an unsafe or unsound manner or otherwise threatens the safety or soundness of the bank, the OCC will direct the bank or operating subsidiary to take appropriate remedial action, which may include requiring the bank to divest or liquidate the operating subsidiary, or discontinue specified activities." 12 CFR § 5.34(e)(3) (2006).

In 1999, Congress defined and regulated "financial" subsidiaries; simultaneously, Congress distinguished those national bank affiliates from subsidiaries-typed "operating subsidiaries" by OCC-which may engage only in activities national banks may engage in

directly, "subject to the same terms and conditions that govern the conduct of such activities by national banks." Gramm-Leach-Bliley Act (GLBA), § 121(a)(2), 113 Stat. 1378 (codified at 12 U.S.C. § 24a(g)(3)(A)). [FN9] For supervisory purposes, OCC treats national banks and their operating subsidiaries as a single economic enterprise. Comptroller's Handbook 64. OCC oversees both entities by reference to "business line," applying the same controls whether banking "activities are conducted directly or through an operating subsidiary." *Ibid.* [FN10]

FN9. OCC subsequently revised its regulations to track the statute. See § 5.34(e)(1), (3); Financial Subsidiaries and Operating Subsidiaries, 65 Fed.Reg. 12905, 12911 (2000). Cf. *post*, at ----10 (dissent's grudging acknowledgment that Congress "may have acquiesced" in OCC's position that national banks may engage in "the business of banking" through operating subsidiaries empowered to do only what the bank itself can do).

FN10. For example, "for purposes of applying statutory or regulatory limits, such as lending limits or dividend restrictions," *e.g.*, 12 U.S.C. §§ 56, 60, 84, 371d, "[t]he results of operations of operating subsidiaries are consolidated with those of its parent." Comptroller's Handbook 64. Likewise, for accounting and regulatory reporting purposes, an operating subsidiary is treated as part of the member bank; assets and liabilities of the two entities are combined. See 12 CFR §§ 5.34(e)(4)(i), 223.3(w) (2006). OCC treats financial subsidiaries differently. A national bank may not consolidate the assets and liabilities of a financial subsidiary with those of the bank. Comptroller's Handbook 64. It cannot be fairly maintained "that the transfer in 2003 of [Wachovia Mortgage's] ownership from the holding company to the Bank" resulted in no relevant changes to the company's business. Compare *post*, at ----14, with *supra*, at ----, 11, n. 8. On becoming Wachovia's operating subsidiary, Wachovia Mortgage became subject to the same terms and conditions as national banks, including the full supervisory authority of OCC. This change exposed the company to significantly more federal oversight than it experienced as a state

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nondepository institution.

**\*9** As earlier noted, Watters does not contest the authority of national banks to do business through operating subsidiaries. Nor does she dispute OCC's authority to supervise and regulate operating subsidiaries in the same manner as national banks. Still, Watters seeks to impose state regulation on operating subsidiaries over and above regulation undertaken by OCC. But just as duplicative state examination, supervision, and regulation would significantly burden mortgage lending when engaged in by national banks, see *supra*, at ---- - ----6-10, so too would those state controls interfere with that same activity when engaged in by an operating subsidiary.

We have never held that the preemptive reach of the NBA extends only to a national bank itself. Rather, in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's *powers*, not on its corporate structure. See, *e.g.*, Barnett Bank, 517 U.S., at 32, 116 S.Ct. 1103. And we have treated operating subsidiaries as equivalent to national banks with respect to powers exercised under federal law (except where federal law provides otherwise). In NationsBank of N. C., N. A., 513 U.S., at 256-261, 115 S.Ct. 810, for example, we upheld OCC's determination that national banks had "incidental" authority to act as agents in the sale of annuities. It was not material that the function qualifying as within "the business of banking," § 24 Seventh, was to be carried out not by the bank itself, but by an operating subsidiary, *i.e.*, an entity "subject to the same terms and conditions that govern the conduct of [the activity] by national banks [themselves]." § 24a(g)(3)(A); 12 CFR § 5.34(e)(3) (2006). See also Clarke v. Securities Industry Assn., 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (national banks, acting through operating subsidiaries, have power to offer discount brokerage services).[FN11]

> FN11. Cf. Marquette Nat. Bank of Minneapolis v. First of Omaha Service Corp., 439 U.S. 299, 308, and n. 24, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978) (holding that national bank may charge home State's interest rate, regardless of more restrictive usury laws in borrower's State, but declining to consider operating subsidiaries).

Security against significant interference by state regulators is a characteristic condition of the "business of banking" conducted by national banks, and mortgage lending is one aspect of that business. See, *e.g.*, 12 U.S.C. § 484(a); 12 CFR § 34.4(a)(1) (2006). See also *supra*, at ---- - ----6-10; *post*, at ----6 (acknowledging that, in 1982, Congress broadly authorized national banks to engage in mortgage lending); *post*, at ----16, and n. 20 (acknowledging that operating subsidiaries "are subject to the same federal oversight as their national bank parents"). That security should adhere whether the business is conducted by the bank itself or is assigned to an operating subsidiary licensed by OCC whose authority to carry on the business coincides completely with that of the bank. See Wells Fargo Bank, N.A. v. Boutris, 419 F.3d 949, 960 (C.A.9 2005) (determination whether to conduct business through operating subsidiaries or through subdivisions is "essentially one of internal organization").

Watters contends that if Congress meant to deny States visitorial powers over operating subsidiaries, it would have written § 484(a)'s ban on state inspection to apply not only to national banks but also to their affiliates. She points out that § 481, which authorizes OCC to examine "affiliates" of national banks, does not speak to state visitorial powers. This argument fails for two reasons. *First*, one cannot ascribe any intention regarding operating subsidiaries to the 1864 Congress that enacted § § 481 and 484, or the 1933 Congress that added the provisions on examining affiliates to § 481 and the definition of "affiliate" to § 221a. That is so because operating subsidiaries were not authorized until 1966. See *supra*, at ----11. Over the past four decades, during which operating subsidiaries have emerged as important instrumentalities of national banks, Congress and OCC have indicated no doubt that such subsidiaries are "subject to the same terms and conditions" as national banks themselves.

**\*10** *Second*, Watters ignores the distinctions Congress recognized among "affiliates." The NBA broadly defines the term "affiliate" to include "any corporation" controlled by a national bank, including a subsidiary. See 12 U.S.C. § 221a(b). An operating subsidiary is therefore one type of "affiliate." But unlike affiliates that may engage in functions not authorized by the NBA, *e.g.*, financial subsidiaries, an operating subsidiary is tightly tied to its parent by the specification that it may engage only in "the business of banking" as authorized by the Act. § 24a(g)(3)(A); 12 CFR § 5.34(e)(1) (2006). See also *supra*, at ---- - ----11-12, and n. 10. Notably, when Congress amended the NBA confirming that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
Page 12

--- S.Ct. ----, 2007 WL 1119539 (U.S.)

(Cite as: --- S.Ct. ----)

operating subsidiaries may "engag[e] solely in activities that national banks are permitted to engage in directly," 12 U.S.C. § 24a(g)(3)(A), it did so in an Act, the GLBA, providing that other affiliates, authorized to engage in nonbanking financial activities, *e.g.*, securities and insurance, are subject to state regulation in connection with those activities. See, *e.g.*, § § 1843(k), 1844(c)(4). See also 15 U.S.C. § 6701(b) (any person who sells insurance must obtain a state license to do so).[FN12]

> FN12. The dissent protests that the GLBA does not itself preempt the Michigan provisions at issue. Cf. *post*, at --- - ----15-17. We express no opinion on that matter. Our point is more modest: The GLBA simply demonstrates Congress' formal recognition that national banks have incidental power to do business through operating subsidiaries. See *supra*, at --- - ----11-12; cf. *post*, at --- - ----9-10.

### C

[5] Recognizing the necessary consequence of national banks' authority to engage in mortgage lending through an operating subsidiary "subject to the same terms and conditions that govern the conduct of such activities by national banks," 12 U.S.C. § 24a(g)(3)(A), see also § 24 Seventh, OCC promulgated 12 CFR § 7.4006 (2006): "Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." See Investment Securities; Bank Activities & Operations; Leasing, 66 Fed.Reg. 34784, 34788 (2001). Watters disputes the authority of OCC to promulgate this regulation and contends that, because preemption is a legal question for determination by courts, § 7.4006 should attract no deference. See also *post*, at ---- - ----17-23. This argument is beside the point, for under our interpretation of the statute, the level of deference owed to the regulation is an academic question. Section 7.4006 merely clarifies and confirms what the NBA already conveys: A national bank has the power to engage in real estate lending through an operating subsidiary, subject to the same terms and conditions that govern the national bank itself; that power cannot be significantly impaired or impeded by state law. See, *e.g.*, *Barnett Bank*, 517 U.S., at 33-34, 116 S.Ct. 1103; 12 U.S.C. § § 24 Seventh, 24a(g)(3)(A), 371.[FN13]

> FN13. Because we hold that the NBA itself-independent of OCC's regulation-preempts the application of the pertinent Michigan laws to national bank operating subsidiaries, we need not consider the dissent's lengthy discourse on the dangers of vesting preemptive authority in administrative agencies. See *post*, at ---- - ----17-23; cf. *post*, at ---- - ----23-24 (maintaining that "[w]hatever the Court says, this is a case about an administrative agency's power to preempt state laws," and accusing the Court of "endors[ing] administrative action whose sole purpose was to preempt state law rather than to implement a statutory command").

The NBA is thus properly read by OCC to protect from state hindrance a national bank's engagement in the "business of banking" whether conducted by the bank itself or by an operating subsidiary, empowered to do only what the bank itself could do. See *supra*, at ---- - ----11-12. The authority to engage in the business of mortgage lending comes from the NBA, § 371, as does the authority to conduct business through an operating subsidiary. See § § 24 Seventh, 24a(g)(3)(A). That Act vests visitorial oversight in OCC, not state regulators. § 484(a). State law (in this case, North Carolina law), all agree, governs incorporation-related issues, such as the formation, dissolution, and internal governance of operating subsidiaries.[FN14] And the laws of the States in which national banks or their affiliates are located govern matters the NBA does not address. See *supra*, at ----6. But state regulators cannot interfere with the "business of banking" by subjecting national banks or their OCC-licensed operating subsidiaries to multiple audits and surveillance under rival oversight regimes.

> FN14. Watters does not assert that Wachovia Mortgage is out of compliance with any North Carolina law governing its corporate status.

### III

*11 [6][7] Watters' alternative argument, that 12 CFR § 7.4006 violates the Tenth Amendment to the Constitution, is unavailing. As we have previously explained, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Regulation of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
**(Cite as: --- S.Ct. ----)**

national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses. See *Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 58, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) *(per curiam).* The Tenth Amendment, therefore, is not implicated here.

\* \* \*

For the reasons stated, the judgment of the Sixth Circuit is

*Affirmed.*

Justice THOMAS took no part in the consideration or decision of this case.

Justice STEVENS, with whom THE CHIEF JUSTICE and Justice SCALIA join, dissenting.

Congress has enacted no legislation immunizing national bank subsidiaries from compliance with nondiscriminatory state laws regulating the business activities of mortgage brokers and lenders. Nor has it authorized an executive agency to preempt such state laws whenever it concludes that they interfere with national bank activities. Notwithstanding the absence of relevant statutory authority, today the Court endorses an agency's incorrect determination that the laws of a sovereign State must yield to federal power. The significant impact of the Court's decision on the federal-state balance and the dual banking system makes it appropriate to set forth in full the reasons for my dissent.

I

The National Bank Act (or NBA), 13 Stat. 99, authorized the incorporation of national banks, § 5, *id.,* at 98, and granted them "all such incidental powers as shall be necessary to carry on the business of banking," § 8, *id.,* at 98 (codified at 12 U.S.C. § 24 Seventh), subject to regulatory oversight by the Comptroller of the Currency, § 54, 13 Stat. 116. To maintain a meaningful role for state legislation and for state corporations that did not engage in core banking activities, Congress circumscribed national bank authority. Notably, national banks were expressly forbidden from making mortgage loans, § 28, *id.,* at 108.[FN1] Moreover, the shares of national banks, as well their real estate holdings, were subject to nondiscriminatory state taxation, § 41, *id.,* at 111; and while national banks could lend money, state law capped the interest rates they could charge, § 20, *id.,* at 105.

FN1. "There is no more characteristic difference between the state and the national banking laws than the fact that almost without exception, state banks may loan on real estate security, while national banks are prohibited from doing so." G. Barnett, State Banking in the United States Since the Passage of the National Bank Act 50 (1902) (reprint 1983) (hereinafter Barnett).

Originally, it was anticipated that "existing banks would surrender their state charters and re-incorporate under the terms of the new law with national charters."[FN2] That did not happen. Instead, after an initial post-National Bank Act decline, state-chartered institutions thrived.[FN3] What emerged was the competitive mix of state and national banks known as the dual banking system.

FN2. B. Hammond, Banks and Politics in America: from the Revolution to the Civil War 728 (1957).

FN3. *Id.,* at 733. See also Barnett 73-74 (estimating that more than 800 state banks were in operation in 1877, and noting the "remarkable increase in the number of state banks" during the last two decades of the 19th century).

**\*12** This Court has consistently recognized that because federal law is generally interstitial, national banks must comply with most of the same rules as their state counterparts. As early as 1870, we articulated the principle that has remained the lodestar of our jurisprudence: that national banks

"are only exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government .... They are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. *It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.*" *National Bank v. Commonwealth,* 9 Wall. 353, 362, 19 L.Ed. 701 (1870) (emphasis added).[FN4]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----

Page 14

--- S.Ct. ----, 2007 WL 1119539 (U.S.)

**(Cite as: --- S.Ct. ----)**

FN4. See also *McClellan v. Chipman,* 164 U.S. 347, 357, 17 S.Ct. 85, 41 L.Ed. 461 (1896) (explaining that our cases establish "a rule and an exception, the rule being the operation of general state laws upon the dealings and contracts of national banks, the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge the duties imposed upon them by the law of the United States").

Until today, we have remained faithful to the principle that nondiscriminatory laws of general application that do not "forbid" or "impair significantly" national bank activities should not be preempted. See, *e.g., Barnett Bank of Marion Cty., N.A. v. Nelson,* 517 U.S. 25, 33, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996).[FN5]

FN5. See also *Anderson Nat. Bank v. Luckett,* 321 U.S. 233, 248, 64 S.Ct. 599, 88 L.Ed. 692 (1944) ("This Court has often pointed out that national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions"); *Davis v. Elmira Savings Bank,* 161 U.S. 275, 290, 16 S.Ct. 502, 40 L.Ed. 700 (1896) ("Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation")

Nor is the Court alone in recognizing the vital role that state legislation plays in the dual banking system. Although the dual banking system's main virtue is its divergent treatment of national and state banks,[FN6] Congress has consistently recognized that state law must usually govern the activities of both national and state banks for the dual banking system to operate effectively. As early as 1934, Justice Brandeis observed for the Court that this congressional recognition is embodied in a long string of statutes:

FN6. See Scott, The Dual Banking System: A Model of Competition in Regulation, 30 Stan. L.Rev. 1, 8-13 (1978) (explaining the perceived benefits of the dual banking system).

"The policy of equalization was adopted in the National Bank Act of 1864, and has ever since been applied, in the provision concerning taxation. In amendments to that act and in the Federal Reserve Act and amendments thereto the policy is expressed in provisions conferring power to establish branches; in those conferring power to act as fiduciary; in those concerning interest on deposits; and in those concerning capitalization. It appears also to have been of some influence in securing the grant in 1913 of the power to loan on mortgage." *Lewis v. Fidelity & Deposit Co. of Md.,* 292 U.S. 559, 564-565, 54 S.Ct. 848, 78 L.Ed. 1425 (footnotes, with citations to relevant statutes, omitted).[FN7]

FN7. See also *First Nat. Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 261, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966) (observing that in passing the McFadden Act, "Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864").

For the same reasons, we observed in *First Nat. Bank in Plant City v. Dickinson,* 396 U.S. 122, 133, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), that "[t]he policy of competitive equality is ... firmly embedded in the statutes governing the national banking system." So firmly embedded, in fact, that "the congressional policy of competitive equality with its deference to state standards" is not "open to modification by the Comptroller of the Currency." *Id.,* at 138, 90 S.Ct. 337.

II

*13 Although the dual banking system has remained intact, Congress has radically transformed the national bank system from its Civil War antecedent and brought considerably more federal authority to bear on state-chartered institutions. Yet despite all the changes Congress has made to the national bank system, and despite its exercise of federal power over state banks, it has never preempted state laws like those at issue in this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
**(Cite as: --- S.Ct. ----)**

Most significantly, in 1913 Congress established the Federal Reserve System to oversee federal monetary policy through its influence over the availability of credit. Federal Reserve Act § § 2, 9, 38 Stat. 252, 259. The Act required national banks and permitted state banks to become Federal Reserve member banks, and subjected all member banks to Federal Reserve regulations and oversight. *Ibid.* Also of signal importance, after the banking system collapsed during the Great Depression, Congress required all member banks to obtain deposit insurance from the newly established Federal Deposit Insurance Corporation. Banking Act of 1933 (or Glass-Steagall Act), § 8, 48 Stat. 168; see also Banking Act of 1935, 49 Stat. 684. Although both of these steps meant that many state banks were subjected to significant federal regulation, [FN8] "the state banking system continued along with the national banking system, with no attempt to exercise preemptive federal regulatory authority over the activities of the existing state banks." M. Malloy, Banking and Financial Services Law 48 (2d ed.2005).

> FN8. What has emerged are "two interrelated systems in which most state-chartered banks are subject to varying degrees of federal regulation, and where state laws are made applicable, to a varying extent, to federally-chartered institutions." 1 A. Graham, Banking Law § 1.04, p. 1-12 (Nov.2006).

In addition to these systemic overhauls, Congress has over time modified the powers of national banks. The changes are too various to recount in detail, but two are of particular importance to this case. First, Congress has gradually relaxed its prohibition on mortgage lending by national banks. In 1913, Congress authorized national banks to make loans secured by farm land, Federal Reserve Act, § 24, 38 Stat. 273, and in succeeding years, their mortgage-lending power was enlarged to cover loans on real estate in the vicinity of the bank, Act of Sept. 7, 1916, 39 Stat. 754, and loans "secured by first liens upon forest tracts which are properly managed in all respects," Act of Aug. 15, 1953, ch. 510, 67 Stat. 614. Congress substantially expanded national banks' power to make real estate loans in 1974, see Housing and Community Development Act, Title VII, § 711, 88 Stat 716, and in 1982 it enacted the broad language, now codified at 12 U.S.C. § 371(a), authorizing national banks to make "loans ... secured by liens on interests in real estate." Garn-St Germain

Depository Institutions Act of 1982, Title IV, § 403, 96 Stat. 1510. While these changes have enabled national banks to engage in more evenhanded competition with state banks, they certainly reflect no purpose to give them any competitive advantage. [FN9]

> FN9. It is noteworthy that the principal cases that the Court cites to support its conclusion that the federal statute itself preempts the Michigan laws were decided years before Congress authorized national banks to engage in mortgage lending and years before the Office of the Comptroller of the Currency (OCC) authorized their use of operating subsidiaries. See *ante,* at ----, ---- 6, 9.

Second, Congress has over the years both curtailed and expanded the ability of national banks to affiliate with other companies. In the early part of the century, banks routinely engaged in investment activities and affiliated with companies that did the same. The Glass-Steagall Act put an end to that. "[E]nacted in 1933 to protect bank depositors from any repetition of the widespread bank closings that occurred during the Great Depression," *Board of Governors, FRS v. Investment Company Institute, 450 U.S. 46, 61, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981),* Glass-Steagall prohibited Federal Reserve member banks (both state and national) from affiliating with investment banks. [FN10] In Congress' view, the affiliates had engaged in speculative activities that in turn contributed to commercial banks' Depression-era failures. [FN11] It was this focus on the welfare of depositors-as opposed to stockholders-that provided the basis for legislative action designed to ensure bank solvency.

> FN10. In *Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971),* we set aside a regulation issued by the Comptroller of the Currency authorizing banks to operate collective investment funds because that activity was prohibited by the Glass-Steagall Act. Similarly, in *Securities Industry Assn. v. Board of Governors, FRS, 468 U.S. 137, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984),* the Glass-Steagall Act provided the basis for invalidating a regulation authorizing banks to enter the business of selling third-party commercial paper.

> FN11. See J. Macey, G. Miller, & R.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----                                                        Page 16
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
(Cite as: --- S.Ct. ----)

Carnell, Banking Law and Regulation 21 (3d ed.2001) (describing "the alleged misdeeds of the large banks' securities affiliates and the ways in which such affiliations could promote unsound lending, irresponsible speculation, and conflicts of interest").

*14 A scant two years later, Congress forbade national banks from owning the shares of any company because of a similar fear that such ownership could undermine the safety and soundness of national banks: [FN12] "Except as hereinafter provided or otherwise permitted by law, nothing herein contained shall authorize the purchase by [a national bank] for its own account of *any* shares of stock of *any* corporation." Banking Act of 1935, § 308(b), 49 Stat. 709 (emphasis added). That provision remains on the books today. See 12 U.S.C. § 24 Seventh.

FN12. See 31 Fed.Reg. 11459 (1966).

These congressional restrictions did not forbid all affiliations, however, and national banks began experimenting with new corporate forms. One of those forms involved the national bank ownership of "operating subsidiaries." In 1966, the Comptroller of the Currency took the position "that a national bank may acquire and hold the controlling stock interest in a subsidiary operations corporation" so long as that corporation's "functions or activities ... are limited to one or several of the functions or activities that a national bank is authorized to carry on." 31 Fed.Reg. 11459 (1966). The Comptroller declined to read the categorical prohibition on national bank ownership of stock to foreclose bank ownership of operating subsidiaries, finding authority for this aggressive interpretation of national bank authority in the "incidental powers" provision of 12 U.S.C. § 24 Seventh. See 31 Fed.Reg. 11460.

While Congress eventually restricted some of the new corporate structures, [FN13] it neither disavowed nor endorsed the Comptroller's position on national bank ownership of operating subsidiaries. Notwithstanding the congressional silence, in 1996 the OCC once again attempted to expand national banks' ownership powers. The agency issued a regulation permitting national bank operating subsidiaries to undertake activities that the bank was *not* allowed to engage in directly. 12 CFR § § 5.34(d), (f) (1997) (authorizing national banks to "acquire or establish an operating subsidiary to

engage in [activities] different from that permissible for the parent national bank," so long as those activities are "part of or incidental to the business of banking, as determined by the Comptroller of the Currency"); see also 61 Fed.Reg. 60342 (1996).

FN13. See Bank Holding Company Act of 1956, 70 Stat. 133; Bank Holding Company Act Amendments of 1970, 84 Stat. 1760.

Congress overruled this OCC regulation in 1999 in the Gramm-Leach-Bliley Act (GLBA), 113 Stat. 1338. The GLBA was a seminal piece of banking legislation inasmuch as it repealed the Glass-Steagall Act's ban on affiliations between commercial and investment banks. See § 101, *id.,* at 1341. More relevant to this case, however, the GLBA addressed the powers of national banks to own subsidiary corporations. The Act provided that any national bank subsidiary engaging in activities forbidden to the parent bank would be considered a "financial subsidiary," § 121, *id.,* at 1380, and would be subjected to heightened regulatory obligations, see, *e.g.,* 12 U.S.C. § 371c-1(a)(1). The GLBA's definition of "financial subsidiaries" excluded those subsidiaries that "engag[e] solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks." § 24a(g)(3).

*15 By negative implication, then, only subsidiaries engaging in purely national bank activities-which the OCC had termed "operating subsidiaries," but which the GLBA never mentions by name-could avoid being subjected to the restrictions that applied to financial subsidiaries. Compare § 371c(b)(2) (exempting subsidiaries from certain regulatory restrictions) with § 371c(e) (clarifying that financial subsidiaries are not to be treated as "subsidiaries"). Taken together, these provisions worked a rejection of the OCC's position that an *operating* subsidiary could engage in activities that national banks could not engage in directly.[FN14] See § 24a(g)(3). Apart from this implicit rejection of the OCC's 1996 regulation, however, the GLBA does not even mention operating subsidiaries.

FN14. While the statutory text provides ample support for this conclusion, it is noteworthy that it was so understood by contemporary commentators. See, *e.g.,* 145 Cong. Rec. 29681 (1999) ("Recently, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
(Cite as: --- S.Ct. ----)

Comptroller of the Currency has interpreted section 24 (Seventh) of the National Bank Act to permit national banks to own and control subsidiaries engaged in activities that national banks cannot conduct directly. These decisions and the legal reasoning therein are erroneous and contrary to the law. The [GLBA] overturns these decisions ... ." (statement of Representative Bliley)).

In sum, Congress itself has never authorized national banks to use subsidiaries incorporated under state law to perform traditional banking functions. Nor has it authorized OCC to "license" any state-chartered entity to do so. The fact that it may have acquiesced in the OCC's expansive interpretation of its authority is a plainly insufficient basis for finding preemption.

III

It is familiar learning that "[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (internal quotation marks omitted). In divining that congressional purpose, I would have hoped that the Court would hew both to the NBA's text and to the basic rule, central to our federal system, that "[i]n all pre-emption cases ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Had it done so, it could have avoided the untenable conclusion that Congress meant the NBA to preempt the state laws at issue here.

The NBA in fact evinces quite the opposite congressional purpose. It provides in 12 U.S.C. § 484(a) that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law." Although this exemption from state visitorial authority has been in place for more than 140 years, see § 54, 13 Stat. 116 (national banks "shall not be subject to any other visitorial powers than such as are authorized by this act"), it is significant that Congress has never extended 12 U.S.C. § 484(a)'s preemptive blanket to cover national bank *subsidiaries.*

**\*16** This is not, contrary to the Court's suggestion, see *ante,* at ---- - ----14-15, some kind of oversight.

As the complex history of the banking laws demonstrates, Congress has legislated extensively with respect to national bank "affiliates"-an operating subsidiary is one type of affiliate [FN15]-and has moreover given the OCC extensive supervisory powers over those affiliates, see § 481 (providing that a federal examiner "shall have power to make a thorough examination of all the affairs of [a national bank] affiliate, and in doing so he shall have power ... to make a report of his findings to the Comptroller of the Currency"). That Congress lavished such attention on national bank affiliates and conferred such far-reaching authority on the OCC without ever expanding the scope of § 484(a) speaks volumes about Congress' preemptive intent, or rather its lack thereof. Consistent with our presumption against preemption-a presumption I do not understand the Court to reject-I would read § 484(a) to reflect Congress' considered judgment not to preempt the application of state visitorial laws to national bank "affiliates."

FN15. See 12 U.S.C. § 221a(b) (defining affiliates to include "any corporation" that a federal member bank owns or controls).

Instead, the Court likens § 484(a) to a congressional afterthought, musing that it merely "recogniz[es] the burdens and undue duplication that state controls could produce." *Ante,* at ----9. By that logic, I take it the Court believes that the NBA would impliedly preempt all state visitorial laws as applied to national banks *even if § 484(a) did not exist.* That is surprising and unlikely. Not only would it reduce the NBA's express preemption provision to so much surplusage, but it would give Congress' silence greater statutory dignity than an express command. Perhaps that explains why none of the four Circuits to have addressed this issue relied on the preemptive force of the NBA itself. Each instead asked whether the OCC's regulations preempted state laws. [FN16] Stranger still, the Court's reasoning would suggest that operating subsidiaries have been exempted from state visitorial authority from the moment the OCC first authorized them in 1966. See 31 Fed.Reg. 11459. Yet if that were true, surely at some point over the last 40 years some national bank would have gone to court to free its subsidiaries from the yoke of state regulation; national banks are neither heedless of their rights nor shy of litigation. But respondents point us to no such cases that predate the OCC's preemption regulations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN16. See *National City Bank of Indiana v. Turnbaugh,* 463 F.3d 325, 331-333 (C.A.4 2006) (holding that State law conflicted with OCC regulations, not with the NBA); *Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 315-316 (C.A.2 2005) (same); 431 F.3d 556, 560-563 (C.A.6 2005) (case below) (same); *Wells Fargo Bank, N.A. v. Boutris,* 419 F.3d 949, 962-967 (C.A.9 2005) (same).

The Court licenses itself to ignore § 484(a)'s limits by reasoning that "when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." *Ante,* at ----7. But it intones this "significant impairment" refrain without remembering that it merely provides a useful tool-not the only tool, and not even the best tool-to discover congressional intent. As we explained in *Barnett Bank,* this Court "take[s] the view that *normally* Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress has explicitly granted." 517 U.S., at 33, 116 S.Ct. 1103 (emphasis added). But any assumption about what Congress "normally" wants is of little moment when Congress has said exactly what it wants.

**\*17** The Court also puts great weight on *Barnett Bank's* reference to our "history ... of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Id.,* at 32, 116 S.Ct. 1103. The Court neglects to mention that *Barnett Bank* is quite clear that this interpretive rule applies only when Congress has failed (as it often does) to manifest an explicit preemptive intent. *Id.,* at 31, 116 S.Ct. 1103. "*In that event,* courts must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent." *Ibid.* (emphasis added). *Barnett Bank* nowhere holds that we can ignore strong indicia of congressional intent whenever a state law arguably trenches on national bank powers. After all, the case emphasized that the question of preemption "is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?" *Id.,* at 30, 116 S.Ct. 1103. The answer here is a resounding no.

Even if it were appropriate to delve into the significant impairment question, the history of this

very case confirms that neither the Mortgage Brokers, Lenders, and Services Licensing Act, Mich. Comp. Laws Ann. § 445.1651 *et seq.* (West 2002 and Supp.2006), nor the Secondary Mortgage Loan Act, § 493.51 *et seq.* (West 2005), conflicts with "the letter or the general objects and purposes of Congressional legislation." *Davis v. Elmira Savings Bank,* 161 U.S. 275, 290, 16 S.Ct. 502, 40 L.Ed. 700 (1896). Enacted to protect consumers from mortgage lending abuses, the Acts require mortgage brokers, mortgage servicers, and mortgage lenders to register with the State, § § 445.1652(1) (West Supp.2006), 493.52(1) (West 2005), to submit certain financial statements, § § 445.1657(2) (West 2002), 493.56a(2) (West 2005), and to submit to state visitorial oversight, § § 445.1661 (West 2002), 493.56b (West 2005). Because the Acts expressly provide that they do not apply to "depository financial institution[s]," § 445.1675a(a) (West 2002), neither national nor state banks are covered.[FN17] The statute therefore covers only nonbank companies incorporated under state law.[FN18]

FN17. While the Court at one point observes that "the Michigan provisions at issue exempt national banks from coverage," see *ante,* ----8, that is because they are "banks," not because they are "national." See *ante,* at ---- - ----2-3 (noting that "Michigan's statutory regime exempts banks, *both national and state,* from state mortgage lending regulation" (emphasis added)).

FN18. The Michigan laws focus on consumer protection, whereas the OCC regulations quoted by the Court focus on protection of bank depositors. See *ante,* at ----7, n. 4, and ----11, n. 8.

Respondent Wachovia Mortgage Corporation has never engaged in the core banking business of accepting deposits. In 1997, when Wachovia Mortgage was first licensed to do business in Michigan, it was owned by a holding company that also owned the respondent Wachovia Bank, N.A. (Neither the holding company nor the Bank did business in Michigan.) There is no evidence, and no reason to believe, that compliance with the Michigan statutes imposed any special burdens on Wachovia Mortgage's activities, or that the transfer in 2003 of its ownership from the holding company to the Bank required it to make any changes whatsoever in its methods of doing business. Neither before nor after that transfer was there any discernible federal interest

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
(Cite as: --- S.Ct. ----)

in granting the company immunity from regulations that applied evenhandedly to its competitors. The mere fact that its activities may also be performed by its banking parent provides at best a feeble justification for immunizing it from state regulation. And it is a justification that the longstanding congressional "policy of competitive equality" clearly outweighs. See _Plant City,_ 396 U.S., at 133, 90 S.Ct. 337.

**\*18** Again, however, it is beside the point whether in the Court's judgment the Michigan laws will hamper national banks' ability to carry out their banking functions through operating subsidiaries. It is _Congress'_ judgment that matters here, and Congress has in the NBA preempted only those laws purporting to lodge with state authorities visitorial power over national banks. 12 U.S.C. § 484(a). In my view, the Court's eagerness to infuse congressional silence with preemptive force threatens the vitality of most state laws as applied to national banks-a result at odds with the long and unbroken history of dual state and federal authority over national banks, not to mention our federal system of government. It is especially troubling that the Court so blithely preempts Michigan laws designed to protect consumers. Consumer protection is quintessentially a "field which the States have traditionally occupied," _Rice,_ 331 U.S., at 230, 67 S.Ct. 1146; [FN19] the Court should therefore have been all the more reluctant to conclude that the "clear and manifest purpose of Congress" was to set aside the laws of a sovereign State, _ibid._

> FN19. See also _General Motors Corp. v. Abrams,_ 897 F.2d 34, 41-43 (C.A.2 1990) ("Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area").

## IV

Respondents maintain that even if the NBA lacks preemptive force, the GLBA's use of the phrase "same terms and conditions" reflects a congressional intent to preempt state laws as they apply to the mortgage lending activities of operating subsidiaries. See 12 U.S.C. § 24a(g)(3). Indeed, the Court obliquely suggests as much, salting its analysis of the NBA with references to the GLBA. See _ante,_ at ---- ----13, 15. Even a cursory review of the GLBA's text shows that it cannot bear the preemptive weight respondents (and perhaps the Court) would assign to

it.

The phrase "same terms and conditions" appears in the _definition_ of "financial subsidiary," not in a provision of the statute conferring national bank powers. Even there, it serves only to describe what a financial subsidiary is not. See § 24a(g)(3) (defining financial subsidiary as any subsidiary "other than a subsidiary that ... engages solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks"). Apart from this slanting reference, the GLBA _never mentions_ operating subsidiaries. Far from a demonstration that the "clear and manifest purpose of Congress" was to preempt the type of law at issue here, _Rice,_ 331 U.S., at 230, 67 S.Ct. 1146, the "same terms and conditions" language at most reflects an uncontroversial acknowledgment that operating subsidiaries of national banks are subject to the same federal oversight as their national bank parents. [FN20] It has nothing to do with preemption.

> FN20. See 31 Fed.Reg. 11460 (noting that OCC maintains regulatory oversight of operating subsidiaries).

Congress in fact disavowed any such preemptive intent. Section 104 of the GLBA is titled "Operation of State Law," 113 Stat. 1352, and it devotes more than 3,000 words to explaining which state laws Congress meant the GLBA to preempt. Leave aside the oddity of a Congress that addresses preemption in exquisite detail in one provision of the GLBA but (according to respondents) uses only four words to express a preemptive intent elsewhere in the statute. More importantly, § 104(d)(4) provides that "_[n]o State statute ... shall be preempted_ " by the GLBA unless that statute has a disparate impact on federally chartered depository institutions, "_prevent[s]_ a depository institution or affiliate thereof from engaging in activities authorized or permitted by this Act," or "conflict[s] with the intent of this Act generally to permit affiliations that are authorized or permitted by Federal law." _Id.,_ at 1357 (emphasis added) (codified at 15 U.S.C. § 6701(d)(4)). No one claims that the Michigan laws at issue here are discriminatory, forbid affiliations, or "prevent" any operating subsidiary from engaging in banking activities. It necessarily follows that the GLBA does not preempt them.

**\*19** Even assuming that the phrase has something to

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
(Cite as: --- S.Ct. ----)

do with preemption, it is simply not the case that the nonencroachment of state regulation is a "term and condition" of engagement in the business of banking. As a historical matter, state laws have always applied to national banks and have often encroached on the business of banking. See *National Bank,* 9 Wall., at 362, 19 L.Ed. 701 (observing that national banks "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation"). The Court itself acknowledges that state usury, contract, and property law govern the activities of national banks and their subsidiaries, *ante,* at ----6, notwithstanding that they vary across "all States in which the banks operate," *ante,* at ----8. State law has always provided the legal backdrop against which national banks make real estate loans, and "[t]he fact that the banking agencies maintain a close surveillance of the industry with a view toward preventing unsound practices that might impair liquidity or lead to insolvency does not make federal banking regulation all-pervasive." *United States v. Philadelphia Nat. Bank,* 374 U.S. 321, 352, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

### V

In my view, the most pressing questions in this case are whether Congress has delegated to the Comptroller of the Currency the authority to preempt the laws of a sovereign State as they apply to operating subsidiaries, and if so, whether that authority was properly exercised here. See 12 CFR § 7.4006 (2006) ("State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank"). Without directly answering either question, the Court concludes that preemption is the "necessary consequence" of various congressional statutes. *Ante,* at ----15. Because I read those statutes differently, I must consider (as did the four Circuits to have addressed this issue) whether an administrative agency can assume the power to displace the duly enacted laws of a state legislature.

To begin with, Congress knows how to authorize executive agencies to preempt state laws.[FN21] It has not done so here. Nor does the statutory provision authorizing banks to engage in certain lines of business that are "incidental" to their primary business of accepting and managing the funds of depositors expressly or implicitly grant the OCC the power to immunize banks or their subsidiaries from state regulation.[FN22] See 12 U.S.C. § 24 Seventh. For there is a vast and obvious difference between rules

authorizing or regulating conduct and rules granting immunity from regulation. The Comptroller may well have the authority to decide whether the activities of a mortgage broker, a real estate broker, or a travel agent should be characterized as "incidental" to banking, and to approve a bank's entry into those businesses, either directly or through its subsidiaries. See, *e.g., NationsBank of N. C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 258, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (upholding the OCC's interpretation of the "incidental powers" provision to permit national banks to serve as agents in annuity sales). But that lesser power does not imply the far greater power to immunize banks or their subsidiaries from state laws regulating the conduct of their competitors.[FN23] As we said almost 40 years ago, "the congressional policy of competitive equality with its deference to state standards" is not "open to modification by the Comptroller of the Currency." *Plant City,* 396 U.S., at 138, 90 S.Ct. 337.[FN24]

> FN21. See, *e.g.,* 47 U.S.C. § § 253(a), (d) (authorizing the Federal Communications Commission to preempt "any [state] statute, regulation, or legal requirement" that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service"); 30 U.S.C. § 1254(g) (preempting any statute that conflicts with "the purposes and the requirements of this chapter" and permitting the Secretary of the Interior to "set forth any State law or regulation which is preempted and superseded"); 49 U.S.C. § 5125(d) (authorizing the Secretary of Transportation to decide whether a state or local statute that conflicts with the regulation of hazardous waste transportation is preempted).

> FN22. Congress did make an indirect reference to regulatory preemption in the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, § 114, 108 Stat. 2367 (codified at 12 U.S.C. § 43(a)). The Riegle-Neal Act requires the OCC to jump through additional procedural hoops (specifically, notice and comment, even for opinion letters and interpretive rules) before "conclud[ing] that Federal law preempts the application to a national bank of any State law regarding community reinvestment, consumer protection, fair lending, or the establishment of intrastate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

branches." *Ibid.* By its own terms, however, this provision *granted* no preemption authority to the OCC.

FN23. In a recent adoption of a separate preemption regulation, the OCC located the source of its authority to displace state laws in 12 U.S.C. § § 93a and 371. See 69 Fed.Reg. 1908 (2004). Both provisions are generic authorizations of rulemaking authority, however, and neither says a word about preemption. See 12 U.S.C. § 93a ("[T]he Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office"); § 371(a) (authorizing national banks to make real estate loans "subject to ... such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order"). Needless to say, they provide no textual foundation for the OCC's assertion of preemption authority.

FN24. This conclusion does not touch our cases holding that a properly promulgated agency regulation can have a preemptive *effect* should it conflict with state law. See *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes"); see also *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 154-159, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (holding that a regulation authorizing federal savings-and-loan associations to include due-on-sale clauses in mortgage contracts conflicted with a state-court doctrine that such clauses were unenforceable); *City of New York v. FCC,* 486 U.S. 57, 59, 65-70, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988) (finding that the FCC's adoption of "regulations that establish technical standards to govern the quality of cable television signals" preempted local signal quality standards). My analysis is rather confined to agency regulations (like the one at issue here) that "purpor[t] to settle the scope of federal preemption" and "reflec[t] an agency's effort to transform the preemption question from a judicial inquiry into an administrative *fait accompli.*" See Note, The Unwarranted Regulatory Preemption of Predatory Lending Laws, 79 N.Y.U.L.Rev. 2274, 2289 (2004).

*20 Were I inclined to assume (and I am not) that congressional silence should be read as a conferral of preemptive authority, I would not find that the OCC has actually exercised any such authority here. When the agency promulgated 12 CFR § 7.4006, it explained that "[t]he section itself *does not effect preemption of any State law;* it reflects the conclusion we believe a Federal court would reach, even in the absence of the regulation ... ." 66 Fed.Reg. 34790 (2001) (emphasis added). Taking the OCC at its word, then, § 7.4006 has no preemptive force of its own, but merely predicts how a federal court's analysis will proceed.

Even if the OCC did intend its regulation to preempt the state laws at issue here, it would still not merit *Chevron* deference. No case from this Court has ever applied such a deferential standard to an agency decision that could so easily disrupt the federal-state balance. To be sure, expert agency opinions as to which state laws conflict with a federal statute may be entitled to "some weight," especially when "the subject matter is technical" and "the relevant history and background are complex and extensive." *Geier v. American Honda Motor Co.,* 529 U.S. 861, 883, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). But "[u]nlike Congress, administrative agencies are clearly not designed to represent the interests of States, yet with relative ease they can promulgate comprehensive and detailed regulations that have broad preemption ramifications for state law." *Id.,* at 908, 120 S.Ct. 1913 (STEVENS, J., dissenting). [FN25] For that reason, when an agency purports to decide the scope of federal preemption, a healthy respect for state sovereignty calls for something less than *Chevron* deference. See 529 U.S., at 911-912, 120 S.Ct. 1913; see also *Medtronic,* 518 U.S., at 512, 116 S.Ct. 2240 (O'Connor, J., concurring in part and dissenting in part) ("It is not certain that an agency regulation determining the pre-emptive effect of *any* federal statute is entitled to deference").

FN25. See also Mendelson, *Chevron* and Preemption, 102 Mich. L.Rev. 737, 779-790 (2003-2004) (arguing that agencies are generally insensitive to federalism concerns).

In any event, neither of the two justifications the OCC advanced when it promulgated 12 CFR § 7.4006 withstand *Chevron* analysis. First, the OCC observed that the GLBA "expressly acknowledged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)

Page 22

(Cite as: --- S.Ct. ----)

the authority of national banks to own subsidiaries" that conduct national bank activities " 'subject to the same terms and conditions that govern the conduct of such activities by national banks.' " 66 Fed.Reg. 34788 (quoting 12 U.S.C. § 24a(g)(3)). The agency also noted that it had folded the " 'same terms and conditions' " language into an implementing regulation, 66 Fed.Reg. 34788 (citing 12 CFR § 5.34(e)(3) (2001)). According to the OCC, "[a] fundamental component of these descriptions of the characteristics of operating subsidiaries in GLBA and the OCC's rule is that state laws apply to operating subsidiaries to the same extent as they apply to the parent national bank." 66 Fed.Reg. 34788.

**\*21** This is incorrect. As explained above, the GLBA's offhand use of the "same terms and conditions" language says nothing about preemption. See *supra*, at ---- - ----15-17. Nor can the OCC's incorporation of that language into a regulation support the agency's position: "Simply put, the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute." *Gonzales v. Oregon*, 546 U.S. 243, 257, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). The OCC's argument to the contrary is particularly surprising given that when it promulgated its "same terms and conditions" regulation, it said not one word about preemption or the federalism implications of its rule—an inexplicable elision if a "fundamental component" of the phrase is the need to operate unfettered by state oversight. Compare 65 Fed.Reg. 12905-12910 (2000), with Exec. Order No. 13132, § § 2, 4, 64 Fed.Reg. 43255, 43257 (1999) (requiring agencies to explicitly consider the "federalism implications" of their chosen policies and to hesitate before preempting state laws).

Second, the OCC describes operating subsidiaries "as the equivalent of departments or divisions of their parent banks," 66 Fed.Reg. 34788, which, through the operation of 12 U.S.C. § 484(a), would not be subject to state visitorial powers. The OCC claims that national banks might desire to conduct their business through operating subsidiaries for the purposes of "controlling operations costs, improving effectiveness of supervision, more accurate determination of profits, decentralizing management decisions [and] separating particular operations of the bank from other operations." Brief for United States as *Amicus Curiae* 19 (quoting 31 Fed.Reg. 11460). It is obvious, however, that a national bank could realize *all* of those benefits through the straightforward expedient of dissolving the

corporation and making it in fact a "department" or a "division" of the parent bank.

Rather, the primary advantage of maintaining an operating subsidiary as a separate corporation is that it shields the national bank from the operating subsidiaries' liabilities. *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiary" (internal quotation marks omitted)). For that reason, the OCC's regulation is about far more than mere "corporate structure," *ante*, at ----13, or "internal governance," *ante*, at ----17 (citing *Wells Fargo Bank, N.A. v. Boutris*, 419 F.3d 949, 960 (C.A.9 2005)); see also *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) ("In issues of corporate law structure often matters"). It is about whether a *state* corporation can avoid complying with *state* regulations, yet nevertheless take advantage of *state* laws insulating its owners from liability. The federal interest in protecting depositors in national banks from their subsidiaries' liabilities surely does not justify a grant of immunity from laws that apply to competitors. Indeed, the OCC's regulation may drive companies seeking refuge from state regulation into the arms of federal parents, harm those state competitors who are not lucky enough to find a federal benefactor, and hamstring States' ability to regulate the affairs of state corporations. As a result, the OCC's regulation threatens both the dual banking system and the principle of competitive equality that is its cornerstone.

VI

**\*22** The novelty of today's holding merits a final comment. Whatever the Court says, this is a case about an administrative agency's power to preempt state laws. I agree with the Court that the Tenth Amendment does not preclude the exercise of that power. But the fact that that Amendment was included in the Bill of Rights should nevertheless remind the Court that its ruling affects the allocation of powers among sovereigns. Indeed, the reasons for adopting that Amendment are precisely those that undergird the well-established presumption against preemption.

With rare exception, we have found preemption only when a federal statute commanded it, see *Cipollone*, 505 U.S., at 517, 112 S.Ct. 2608, when a conflict

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1119539 (U.S.)
**(Cite as: --- S.Ct. ----)**

between federal and state law precluded obedience to both sovereigns, see *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or when a federal statute so completely occupied a field that it left no room for additional state regulation, see *Napier v. Atlantic Coast Line R. Co.,* 272 U.S. 605, 613, 47 S.Ct. 207, 71 L.Ed. 432 (1926). Almost invariably the finding of preemption has been based on this Court's interpretation of statutory language or of regulations plainly authorized by Congress. Never before have we endorsed administrative action whose sole purpose was to preempt state law rather than to implement a statutory command.

Accordingly, I respectfully dissent.

U.S.,2007.
Watters v. Wachovia Bank, N.A.
--- S.Ct. ----, 2007 WL 1119539 (U.S.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.